**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James TWINE, Defendant–Appellant.**

**No. 86–3219.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 7, 1987.

Decided Aug. 1, 1988.

Gilbert H. Levy, Levy & Hamilton, Seattle, Wash., for defendant-appellant.

Sally R. Gustafson, Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellee.

Before HUG, BOOCHEVER and BRUNETTI, Circuit Judges.

BRUNETTI, Circuit Judge:

This is an appeal from the criminal trial of James Twine (Twine) before a federal district court sitting without a jury. Twine was indicted on seven counts of transmitting, via interstate commerce (telephone), threats to kidnap and injure Marilyn Reed (Reed) and others in violation of 18 U.S.C. § 875(c), and on one count of transmitting the same via the mails in violation of 18 U.S.C. § 876. The district judge found Twine guilty on all eight counts of the indictment. We affirm.

I

*Background*

The charges arose out of a bizarre relationship between Twine and Reed that spanned a period of approximately twenty months.

Reed, a preschool teacher, and her sister lived in a group home in Seattle, Washington. In November 1983, they met and formed a friendship with Twine, an unsuccessful business entrepreneur. Twine soon became more partial to Reed, whereas the sister and others at the home began to find Twine odd and bothersome. The relationship nonetheless continued, although apparently on a non-romantic basis.

Twine's peculiarities grew more acute when Reed's boyfriend visited her in February 1984. Twine ignored Reed's request to break contact during the visit and instead escalated his presence both in person and over the telephone. He became so upset by the boyfriend's visit that he was taken to the hospital for emergency psychiatric care. Annoyed, Reed began to back away from her relationship with Twine which only fueled his jealous behavior. In late spring 1984, the two met with a religious counselor of the Sufi order in an attempt to reconcile their differences. Shortly thereafter Twine left for New York on business.

Twine did not renew contact with Reed until the fall, when he began telephoning her from New York feeling depressed and suicidal. He also began to write letters again as he had done in the past. By January 1985, Twine was making between ten and fifty telephone calls to the group home each day. When Reed finally told Twine that she wanted nothing further to do with him, the telephone calls and letters became vulgar and violent.

The frequency of Twine's contacts did not subside. In February 1985 he threatened Reed's sister, prompting her to flee to Africa. In March, Reed and friends installed a telephone recording system and commenced to document the threatening calls. The threats ranged from general threats of physical harm to specific threats against Reed regarding kidnap and rape. Finally, in June or July 1985, Twine announced that he was returning to Seattle. Frightened, Reed immediately filed a complaint with the police which led to Twine's federal indictment for transmitting threats.

At trial, Twine introduced evidence of mental defect, including the psychiatric testimony of Dr. John Petrich. This evidence seems to have been offered to establish an insanity defense. Regardless, Twine argued a diminished capacity defense—that even if he was not legally insane, he lacked the capacity to form the intent necessary for conviction of the charged offenses.

The testimony of Dr. Petrich and others produced an interesting portrait of Twine. Twine is considered a highly intelligent and well educated man. However, he also is a man with a history of psychiatric episodes that continued during the relationship with Reed. As a preschooler he was referred for psychiatric treatment by school authorities. He underwent six weeks of inpatient psychiatric treatment while in high school. And, in 1971 he spent a year in North Africa to escape what he believed was a subliminal neo-fascist conspiracy (by such organizations as EST–Erhard Seminar Training) to alter his mind. Dr. Petrich concluded that Twine suffered from a schi-

zoaffective disorder that manifested itself in depression, hyperactivity, obsession, and paranoia.

The district judge asked the parties to brief the issue of how this mental defect evidence should be applied. He was particularly concerned with the impact on Twine's defense of the Insanity Defense Reform Act of 1984 (the 1984 Act), Pub.L. No. 98–473, Title II, Oct. 12, 1984, 98 Stat. 1976, 2057. After the briefing, the district judge delivered an oral decision. The decision clearly indicates that Twine's evidence did not establish an insanity defense. Twine was later sentenced to five years imprisonment, five years probation, and fined $400.00.

On appeal, Twine argues that his diminished capacity defense was improperly excluded from consideration. He claims that the district judge erroneously construed the 1984 Act to permit only an insanity defense; or in the alternative, erroneously construed §§ 875(c) and 876 to be general intent crimes to which a diminished capacity defense cannot be applied.

The issues of whether the 1984 Act abolished the diminished capacity defense and if not, whether this defense can apply to the charged offenses present questions of law which we review de novo. *See United States v. McConney*, 728 F.2d 1195 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

## II

### *Diminished Capacity*

Evidence of a defendant's mental defect at the time that a particular crime was committed is offered during criminal trials for a variety of purposes. It is most commonly employed to establish the insanity defense. This defense is not concerned with the mens rea element of the crime; rather, it operates to completely excuse the defendant whether or not guilt can be proven.

This case presents us with a second use of mental defect evidence—the diminished capacity defense. Unlike insanity, this defense is not an excuse. Diminished

capacity is directly concerned with whether the defendant possessed the ability to attain the culpable state of mind which defines the crime. Successful defendants simply are not guilty of the offense charged, although they are usually guilty of a lesser included offense. *See United States v. Frisbee*, 623 F.Supp. 1217, 1221 and n. 2 (N.D.Cal.1985).

It is well settled that prior to 1984, this circuit recognized a diminished capacity defense, entirely distinct from the insanity defense. *See United States v. Erskine*, 588 F.2d 721, 722 (9th Cir.1978); *United States v. Winn*, 577 F.2d 86, 90 and n. 1 (9th Cir.1978); *United States v. Demma*, 523 F.2d 981, 986 and n. 14 (9th Cir.1975). However, with passage of the 1984 Act, Congress codified the insanity defense under federal law for the first time and placed significant restrictions on the use of mental defect evidence. Most notably, Section 402(a), 98 Stat. 2057 (codified at 18 U.S.C. § 17, formerly § 20) marked a return to the cognitive M'Naghten test and made insanity an affirmative defense which the defendant must prove by clear and convincing evidence. Further, § 17 provides that beyond insanity, "[m]ental disease or defect does not otherwise constitute a defense." The government contends that the language and history of the 1984 Act cast doubt on the continued viability of the diminished capacity defense.

The seminal case addressing this issue was decided by a district court of this circuit. *See Frisbee*, 623 F.Supp. 1217. In *Frisbee*, the court performed a thorough analysis of the statutory scheme of the 1984 Act, its legislative history, and the very nature of the diminished capacity defense. It was persuaded that § 17 permits mental defect evidence on the issue of whether the defendant had the mental capacity to commit the crime. This opinion provided much of the basis for the decision in *United States v. Gold*, 661 F.Supp. 1127 (D.D.C.1987), which also held that diminished capacity survived the 1984 Act.

Until recently, this issue had not been addressed squarely at the circuit level. Only the First Circuit had expressed a

view, and in dicta assumed that the 1984 Act had abolished the diminished capacity defense. *See United States v. White,* 766 F.2d 22, 24–25 (1st Cir.1985). However, the Third Circuit has now filed a comprehensive opinion that dissects the issue. In *United States v. Pohlot,* 827 F.2d 889, 897 (3d Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988), the court favorably cites *Frisbee* and *Gold,* and embarks on an even more lengthy analysis. It ultimately concludes that Congress was not concerned with the guilt phase of the criminal trial when it enacted § 17. *Id.* at 897, 900.

■ We agree with the courts in *Frisbee, Gold,* and *Pohlot* that the 1984 Act does not abolish the diminished capacity defense. We believe that the rationale set forth in *Frisbee* reflects a proper reading of the legislative purpose and understanding of the complexities surrounding the use of mental defect evidence.

These complexities are largely semantic, due to the confused use of terms such as diminished capacity and diminished responsibility. *See Frisbee,* 623 F.Supp. at 1221 and n. 2 (citing Morse, *Undiminished Confusion in Diminished Capacity,* 75 J.Crim.L. & Crim. 1, 7–9 (1984)); *see also* W. LaFave & A. Scott, *Criminal Law* 325 et seq. (1972). Even so, a careful reading of the 1984 Act and its history persuades us that Congress intended to restrict a defendant's ability to excuse guilt with mental defect evidence, curtailing the insanity defense. But Congress did not intend to eliminate a defendant's ability to disprove guilt with mental defect evidence.[1]

III

### Specific Intent

■ Twine's defense at trial was that he could not have violated 18 U.S.C. §§ 875(c) and 876 because he lacked the capacity to entertain the intent necessary to commit these offenses. Before this defense could be viable, we must determine whether the aforementioned statutes require proof of specific intent. This inquiry is necessary because diminished capacity, like voluntary intoxication, generally is only a defense when specific intent is at issue. *See United States v. Brawner,* 471 F.2d 969, 998–1002 (D.C.Cir.1972). The restrictive use of these defenses reflects the increased probing into the defendant's subjective state of mind that accompanies the trial of a specific intent offense.

Sections 875(c) and 876 are extremely similar criminal statutes. They were enacted as concurrent sections in the Act of June 25, 1948, ch. 645, 62 Stat. 741; and they both proscribe the transmission of threatening communications, albeit via different media. The greatest difference in language between these two statutes is that § 876 contains the word "knowingly" whereas § 875(c) does not.[2] However, in *Seeber v. United States,* 329 F.2d 572, 577 (9th Cir.1964), we held that a jury instruction using the word "knowingly" sufficiently expressed the mental element required by § 875(c). Subsequent decisions of this court exhibit the similarity with which we construe §§ 875(c) and 876. *See United States v. LeVison,* 418 F.2d 624, 626–27 (9th Cir.1969) (to support our conclusion that §§ 875(c) and 876 required proof of an intent to threaten, we drew no distinction

---

**1.** Our holding in no way curtails the district court's "wide latitude in admitting or excluding psychiatric testimony on the question of a defendant's incapacity to form specific intent." *Erskine,* 588 F.2d at 722. However "[w]hile the competence and persuasiveness of the offered testimony can be questioned, the relevance of the subject matter cannot be." *Id.* at 723.

**2.** 18 U.S.C. § 875(c) (as amended) provides as follows:

Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined

not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 876 provides in pertinent part as follows:

Whoever knowingly so deposits or causes to be delivered as aforesaid, any communications with or without a name or designating mark subscribed thereto, addressed to any other person and containing any threat to kidnap any person or any threat to injure the person of the addressee or of another, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

between the statutes); *United States v. Sirhan*, 504 F.2d 818, 819–20 (9th Cir.1974) (holding that § 876 did not require proof of willfulness for a finding of specific intent, relying primarily on § 875(c) case law).

In our *Seeber* decision we made it clear that § 875(c) (and therefore § 876) did not define a strict liability offense. Rather, we held that intent is a "vital issue" in a prosecution under that section. 329 F.2d at 577. More specifically, we reiterated the words of the district judge that "the purpose of adding the word 'knowingly' [to the jury instruction] was to insure that no one would be convicted for an act because of mistake, inadvertence, or other innocent reason." *Id.* This quoted language not only requires proof of culpability, but implies that the level of culpability must exceed a mere transgression of an objective standard of acceptable behavior (e.g., negligence, recklessness). Thus, *Seeber* supports a finding that §§ 875(c) and 876 define specific intent crimes. *See Brawner*, 471 F.2d at 998 ("specific intent [ ] cannot be satisfied merely by showing that defendant failed to conform to an objective standard"); *see also Model Penal Code*, § 2.02 (defining hierarchy of culpability—purpose, knowledge, recklessness, negligence).

Later in *Sirhan*, we expressly took this position, stating that "specific intent is required for conviction under [§ 876]" (and therefore § 875(c)). 504 F.2d at 819. We then went on to embrace the Eighth Circuit's identification, in *Petschl v. United States*, 369 F.2d 769, 770 (8th Cir.1966), of two essential elements of § 876. In *Sirhan*, we were only concerned with the second element, that the defendant knowingly transmitted the communication. We held that this element embodied a requirement of specific intent. 504 F.2d at 819.

The first *Petschl* element, although not expressly mentioned, was at issue in *LeVison*, 418 F.2d 624. In that case, relying on *Seeber* and the decision in *United States v. Dutsch*, 357 F.2d 331, 333 (4th Cir.1966),

we recognized that an intent to threaten is also a required showing. *LeVison*, 418 F.2d at 626. Unlike our *Sirhan* opinion, recognizing the specific intent to transmit element, our *LeVison* opinion did not label the intent to threaten element as a specific intent. In fact, it even used the term "general intent" at one point. *LeVison*, 418 F.2d at 626. However, in context, the word "general" did not invoke the general/specific intent distinction, but rather refers to an intent generally to threaten as opposed to an intent to threaten coupled with an intent to extort money. *See id.* Therefore, we are satisfied that the intent to threaten has yet to be expressly classified by this court as either general or specific.

■ Today we hold that the showing of an intent to threaten, required by §§ 875(c) and 876, is a showing of specific intent.[3] Our conclusion, although primarily based on *Seeber*, previously discussed, is strengthened by our decision in *Roy v. United States*, 416 F.2d 874 (9th Cir.1969).

In *Roy* we confronted the question of whether 18 U.S.C. § 871 required a showing of specific intent to threaten. Section 871, which makes it unlawful inter alia to "knowingly and willfully" threaten the President of the United States, is a companion section to §§ 875(c) and 876. After scrutinizing the possible purposes underlying § 871, we concluded that no actual intent to threaten must be shown. We held that culpability could be established by showing that "a reasonable person would foresee that the statement would be interpreted by [the recipient] as a serious expression of an intention to inflict bodily harm upon or to take the life of the President...." *Roy*, 416 F.2d at 877. We can imagine no clearer description of an objective, general intent showing.

We drew our conclusion in the face of Congress' use of the terms "knowingly and willfully," words which the Model Penal Code defines in a subjective manner. *See*

---

**3.** The Eleventh Circuit disagrees with this position, holding that § 876 is a general intent crime. *See United States v. Costello*, 760 F.2d 1123, 1127–28 (11th Cir.1985). The case which *Costello* cites in support of this assertion, how-

ever, holds only that no present intent *to do injury* is required. *United States v. De Shazo*, 565 F.2d 893, 895 (5th Cir.), *cert. denied*, 435 U.S. 953, 98 S.Ct. 1583, 55 L.Ed.2d 804 (1978).

§ 2.02. We explained our decision as follows:

A threat against the President may cause substantial harm and *is qualitatively different from a threat against a private citizen or other public official.* A President not only has a personal interest in his own security, as does everyone, he also has a public duty not to allow himself to be unnecessarily exposed to danger. A President's death in office has worldwide repercussions and affects the security and future of the entire nation.

Roy, 416 F.2d at 877 (emphasis added). Because of the distinction drawn in *Roy,* between the President and private citizens, it is clear that the general intent to threaten required by § 871 is not sufficient for a conviction under §§ 875(c) and 876. These latter sections, concerned with private citizens and other public officials, logically require a showing of a subjective, specific intent to threaten.

Accordingly, and because of the continued viability of the diminished capacity defense, Twine was entitled to have his mental defect evidence considered on the issue of whether he possessed the mental capacity to form the specific intent to threaten the members of the group home, and to transmit his threats.[4]

## IV

### Necessity of Remand

Whereas the district judge's oral decision could have been more precise, it is clear that the judge considered Twine's mental defect evidence on the question of diminished capacity. We are convinced that a remand is not necessary.

When a court does not enter a specific finding, we will uphold the result if it is reasonably supported in the record. *See United States v. Most,* 789 F.2d 1411, 1417 (9th Cir.1986). The district judge did enter three very crucial findings. First, he found that the government had proven, beyond a reasonable doubt, that Twine had actually committed all of the acts charged. Second, he found that at the time the threats were made, Twine appreciated "the nature and quality or the wrongfulness of the acts." Third, he found beyond a reasonable doubt, that Twine was guilty of the crimes charged. Although the second finding is loosely worded in the language of the insanity statute, in context it is reasonable to conclude that Twine's mental defect evidence was considered as part of the guilt phase of the trial and not as an affirmative defense.

The findings indicate that the district judge considered Twine's diminished capacity defense. Specific intent is determined "from all the facts and circumstances surrounding the case." *Sirhan,* 504 F.2d at 819 n. 2. The record before us is replete with documentary and testimonial evidence of Twine's behavior and communications. Our review of this evidence leads us to the inescapable conclusion that Twine intended to transmit his communications, and to thereby threaten various residents of the group home. This, coupled with the district judge's findings that Twine appreciated "the nature and quality or the wrongfulness of the acts" and that beyond a reasonable doubt he committed all the acts charged, indicates that the district judge was aware of and considered Twine's mental defect evidence and alleged diminished capacity when he found Twine guilty beyond a reasonable doubt.

## V

### Conclusion

We agree with Twine that the offenses charged in this case, 18 U.S.C. §§ 875(c) and 876, may be subject to a diminished capacity defense because the prosecution must prove specific intent. We also agree that the 1984 Act did not foreclose Twine

---

4. Our holding that specific intent to threaten and to transmit the threat are essential elements of the crimes defined by §§ 875(c) and 876 does not conflict or disagree with the clear pronouncement of other circuits that specific intent (or ability) to carry out the threat is not an essential element under these sections. *See United States v. Lincoln,* 589 F.2d 379, 381 (8th Cir.1979); *United States v. Chatman,* 584 F.2d 1358, 1360-61 (4th Cir.1978).

from maintaining such a defense. However, we disagree that the district judge took a different position and, as a result, failed to consider Twine's diminished capacity defense. Rather, we find that the district judge considered and was unpersuaded by Twine's diminished capacity defense.

Thus, Twine's conviction is AFFIRMED.