12 F.3d 1109
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert Mitsugi FURUTANI, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Mitsugi FURUTANI, Defendant-Appellant.
 Nos. 92-30061, 92-30071.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 5, 1993.
Decided Nov. 16, 1993.
As Amended June 16, 1994.
 
 Before: GOODWIN, SCHROEDER, and PREGERSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 At a bench trial, Robert Mitsugi Furutani was convicted of two counts of kidnapping in violation of 18 U.S.C. Sec. 1201 and two counts of assault with a deadly weapon in violation of 18 U.S.C. Sec. 113(c). The district court sentenced Furutani under the United States Sentencing Guidelines to concurrent terms of 210 months for each count of kidnapping and 60 months for each count of assault, followed by five years of supervised release.
 
 
 3
 At the same time, the district court revoked Furutani's probation on a 1988 conviction for being a felon in possession of a firearm in violation of 18 U.S.C. Sec. 922(g). The district court conducted a non-Guidelines resentencing hearing and imposed a 60-month sentence, served consecutively to the kidnapping sentence.
 
 
 4
 Furutani now appeals his kidnapping and assault convictions, and the resulting 210-month sentence (Docket No. 92-30071). He also appeals the 60-month term received on resentencing after revocation of probation (Docket No. 92-30061). The two cases have been consolidated for appeal.
 
 
 5
 We have jurisdiction pursuant to 28 U.S.C. Sec. 1291 and 18 U.S.C. Sec. 3742. We now affirm the conviction for kidnapping and assault, and remand for resentencing. Further, we vacate the 60-month sentence imposed after revocation of parole and remand for resentencing.
 
 I. Factual Background
 
 6
 The following facts are not in dispute. Furutani, now age 51, has a long history of serious mental illness, which may stem from the extreme physical abuse his mother inflicted on him during his childhood in Hawaii. Symptoms of mental illness led to his discharge from the U.S. Army in 1964. In 1969, Furutani stabbed his girl friend to death in front of a crowd on a Hawaii college campus. He pled guilty to second degree murder and was sentenced to 50 years in prison. He was released on parole in 1974; his parole was terminated in 1982.
 
 
 7
 Over the years Furutani has received psychiatric treatment as a resident and an outpatient at Veterans' Administration ("VA") facilities in Hawaii and Washington. He has been married four times. He has received social security disability payments and also worked in Washington as a fishing guide and a fishing equipment sales clerk.
 
 
 8
 On November 18, 1987, Furutani called his VA social worker to report that he had a shotgun and felt he was going to kill his girl friend. He surrendered the gun and voluntarily admitted himself to the mental hospital. He was indicted on June 23, 1988 for being a felon in possession of a firearm and pled guilty. He received a five-year prison sentence, suspended in favor of five years' probation with a condition that he continue mental treatment.
 
 
 9
 On January 11, 1991, Furutani went to the American Lake VA hospital and took two employees captive with a large hunting knife and a gun that turned out to be a plastic toy. Furutani put the knife to the throat of Roberta Nugent, an occupational therapist who had worked with Furutani and knew of the 1969 murder. He threatened to stab her, forcing her to disrobe. Dr. Nuernberger, Furutani's VA psychiatrist since 1987, exchanged places with a second hostage, Scott Tomchek, shortly after the incident began. A hostage standoff between Furutani and a police SWAT team followed. During the next eight hours or so, Dr. Nuernberger negotiated with Furutani, medicated him, and convinced him to surrender. Furutani said during and after the incident that he took the hostages in order to provoke a confrontation with the police that would lead to his death.
 
 
 10
 II. Trial for Kidnapping and Assault (No. 92-30071)
 
 A. Procedural Background
 
 11
 At trial Furutani asserted the defenses of insanity, under 18 U.S.C. Sec. 17, and diminished capacity under United States v. Twine, 853 F.2d 676, 679 (9th Cir.1988). Section 17 provides an affirmative defense of insanity when the defendant can prove by clear and convincing evidence that "as a result of severe mental disease or defect [the defendant] was unable to appreciate the nature and quality, or wrongfulness of his acts." 18 U.S.C. Sec. 17. The diminished capacity defense under Twine permits a defendant to use evidence of a mental defect to show that he lacked the capacity to form the culpable state of mind (e.g., intent) for the charged offense. Twine, 853 F.2d 679.
 
 
 12
 Three psychiatrists and a psychologist testified at trial. Two of the psychiatrists, Dr. Risse for the government and Dr. Nuernberger for Furutani, worked at the VA, had treated Furutani and were personally involved in the hostage-taking incident. They testified as percipient witnesses and offered expert medical opinions about Furutani as well.
 
 
 13
 In the government's case-in-chief, Dr. Risse offered his account of the incident and Furutani's medical history. He also opined that a person in Furutani's condition could understand the nature, quality, and wrongfulness of his actions and had the capacity to form the requisite criminal intent.
 
 
 14
 In the defendant's case-in-chief, Dr. Nuernberger gave his version of the hostage-taking incident, Furutani's history, and his mental condition. He testified that Furutani acted in a "dissociative" or "fugue" state but never gave an opinion on the criminal mental capacity of a person in that condition. Then the defense called Dr. Wise, a psychologist, who testified that a hypothetical person in Furutani's mental condition on the day of the seizure lacked the ability to understand the nature, quality, and wrongfulness of his actions, and that such an individual could not form the requisite criminal intent.
 
 
 15
 In rebuttal, the government called Dr. Johnson, a psychiatrist, who, in agreement with Dr. Risse, opined that a hypothetical person in Furutani's condition could understand the nature, quality, and wrongfulness of his actions and form the requisite criminal intent. The government also called an FBI agent to impeach Dr. Nuernberger. The agent reported that the doctor had described Furutani as legally sane shortly after the hostage-taking incident. Also in rebuttal, several lay witnesses described rational behavior by Furutani before the kidnapping.
 
 
 16
 The defense then attempted to call another psychiatrist, Dr. Harris, as a surrebuttal witness to answer the government's arguments in rebuttal. The court excluded the testimony as cumulative.
 
 
 17
 The district court reached a verdict of guilty on all four counts. In sentencing, the court made a four-point upward adjustment for kidnapping to facilitate another crime (aggravated assault) and a two-point upward adjustment for use of a dangerous weapon. It made a downward adjustment of one point for release of the victim within 24 hours, and a downward adjustment of one point for acceptance of responsibility. On all counts the court made a two-point upward departure from the Guidelines range on the basis of extreme psychological injury to the victim, U.S.S.G. Sec. 5K2.3, and a two-point upward departure for extreme conduct, U.S.S.G. Sec. 5K2.8. The court also departed upward from criminal history category II to the maximum sentence of criminal history category III, 210 months, because the Guidelines did not account for the 1969 murder conviction.
 
 
 18
 Furutani appeals his conviction on the basis of three asserted trial errors: the exclusion of surrebuttal testimony, the admission over objection of Dr. Nuernberger's prior statement that Furutani was not legally insane, and the denial of a motion for acquittal based on insufficient evidence to support all elements of the offense of kidnapping.
 
 
 19
 Furutani appeals his sentence, asserting that the district court erred by enhancing his offense level for kidnapping because he acted to facilitate another crime. He also appeals the court's upward departures from the Sentencing Guidelines for extreme psychological injury, for extreme conduct, and for criminal history not accounted for in the Guidelines.
 
 B. Discussion
 
 20
 1. Did the district court err in excluding the surrebuttal
 
 
 21
 testimony of Dr. Harris?
 
 
 22
 Furutani's counsel tried to counter the testimony of the government's rebuttal witnesses by offering the surrebuttal testimony of Dr. Harris, a psychiatrist. After counsel made an extensive offer of proof and offered to limit Dr. Harris's testimony to ten minutes, the district court excluded it as cumulative. Furutani now appeals the exclusion of Dr. Harris's proffered surrebuttal testimony.
 
 
 23
 The district court has the discretion to exclude surrebuttal testimony when it is cumulative. United States v. McCollum, 732 F.2d 1419, 1426 (9th Cir.1984). We review for abuse of discretion the district court's exclusion of surrebuttal testimony. United States v. Butcher, 926 F.2d 811, 817 (9th Cir.1991) (cert. denied, 111 S.Ct. 2273 (1991).
 
 
 24
 During the defense case-in-chief Dr. Wise, a psychologist, offered expert testimony on Furutani's mental capacity, the same subject as the excluded testimony of Dr. Harris. In particular, Dr. Wise had already testified that Furutani's behavior might seem rational to lay observers before the kidnapping. Counsel's offer of proof for Dr. Harris's testimony essentially recapitulated the testimony already given by Dr. Wise. Therefore, the district court acted within its discretion and did not err when it excluded the testimony as cumulative.
 
 
 25
 Furutani argues that because Dr. Harris is a medical doctor, his testimony was necessary to rebut that of Dr. Johnson, the government's psychiatrist. According to Furutani, excluding medical testimony on his behalf infringed on his Sixth Amendment right to rebut new matter. But we have held that when a defendant invokes the insanity defense, the defendant's strategic choice of a psychologist for his case-in-chief does not entitle him to call a psychiatrist in surrebuttal. McCollum at 1426.
 
 
 26
 The defense rested its case after presenting Dr. Wise. Had he testified in surrebuttal, Dr. Harris would have been the fifth mental health professional to testify at trial, the third to testify for Furutani. Since counsel's offer of proof indicates that Furutani did not need Dr. Harris to rebut new matter, but merely to match the qualifications of the government expert, the constitutional right to rebut new matter was not invoked. The district court acted within its discretion when it held the defense to its choice of experts. Id.
 
 
 27
 2. Did the district court err in permitting the government
 
 
 28
 to impeach Dr. Nuernberger with a prior
 
 
 29
 inconsistent statement?
 
 
 30
 Because this evidentiary issue lacks a constitutional dimension, we review for abuse of discretion. Butcher, 926 F.2d at 817.
 
 
 31
 Dr. Nuernberger was Furutani's psychiatrist, and a witness and negotiator during the hostage-taking incident. He testified for the defense regarding Furutani's psychiatric history, the events of January 11, 1991, and Furutani's mental state during the hostage-taking incident. Nuernberger described Furutani as being in a "dissociative" or "fugue" state on that day. On cross-examination, over Furutani's objection, the government asked Nuernberger whether he had told an FBI Special Agent, Alfred Gunn, that Furutani was not legally insane. Nuernberger testified he did not remember making such a statement. During rebuttal, over Furutani's objection, the government sought to impeach Dr. Nuernberger with the testimony of Special Agent Gunn. Gunn testified that, just after Furutani surrendered, he asked Dr. Nuernberger, "Is Mr. Furutani insane?" According to Gunn, Nuernberger answered "Not in this state."
 
 
 32
 If offered to prove Furutani's sanity, Dr. Nuernberger's statement to Gunn (if made) would violate Fed.R.Evid. 704(b), which bars expert opinions on the ultimate issue of a criminal defendant's mental state.[1] Furthermore, for that purpose Agent Gunn's testimony would be hearsay. Fed.R.Evid. 801(c). However, the district court admitted it purely to impeach Dr. Nuernberger, so we must analyze its admissibility for that purpose.
 
 
 33
 The purpose of impeachment is to challenge a witness's credibility regarding the witness's testimony at trial on a material issue. United States v. Bagley, 772 F.2d 482, 487 (9th Cir.1985). All parties agreed that Furutani was mentally ill. The only issue at trial was Furutani's criminal mental capacity. While Dr. Nuernberger testified about Furutani's psychiatric history and the hostage-taking incident, he never expressed an opinion on Furutani's sanity during the kidnapping. Therefore the out-of-court statement of opinion, "not [insane] in this state," which Dr. Nuernberger said he did not remember making, did not directly contradict his testimony in court that Furutani was in a "fugue" or "dissociative" state.
 
 
 34
 The government nevertheless argues that the out-of-court statement served to challenge Dr. Nuernberger's credibility. However, the government never attacked Dr. Nuernberger's credibility regarding his testimony that Furutani was in a "fugue" or "dissociative" state. Instead the government produced Dr. Risse, who agreed with Dr. Nuernberger's account of events, and Dr. Johnson, who agreed with Dr. Nuernberger's "dissociative" diagnosis. Moreover, the government argues that a dissociative state is consistent with criminal mental capacity. This being the case, Dr. Nuernberger's disputed out-court-statement that Furutani was "not [insane] in this state" would, by the government's own lights, be consistent with Dr. Nuernberger's testimony about Furutani's dissociative state. Therefore, evidence of the disputed out-of-court statement was not a proper subject for impeachment and its admission was an abuse of discretion.
 
 
 35
 Dr. Nuernberger's testimony differed from the government witnesses' only in its detailed and more sympathetic account of Furutani's psychiatric history. Because he had treated Furutani and was sympathetic to him, his purported opinion that Furutani was nonetheless legally sane would carry great weight in support of the government's case. But that is substantive evidence of Furutani's sanity, and we have consistently held that the government may not use impeachment to introduce otherwise inadmissible substantive evidence against a defendant. United States v. Crouch, 731 F.2d 621, 623 (9th Cir.1984), cert. denied 469 U.S. 1105 (1984).
 
 
 36
 However, when an evidentiary error does not have constitutional magnitude, we consider it harmless unless the error more likely than not affected the verdict. United States v. Chu, 935 F.2d 990, 994 (9th Cir.1991). The government introduced sufficient admissible evidence of Furutani's guilt and sanity. Therefore the error likely had no material effect on the verdict, making it harmless.
 
 
 37
 We have previously held that a court committed "plain error" when it allowed the government to bring otherwise inadmissible substantive evidence under the guise of impeachment. United States v. Gomez-Gallardo, 915 F.2d 553, 555 (9th Cir.1978). Furutani, apparently based on the principle that plain error cannot be harmless error, argues that Gomez-Gallardo makes the district court's error here reversible. However, a nonconstitutional trial error cannot be reversible error per se; rather, the reviewing court must consider the trial record to determine if the error was so prejudicial that it "tainted" the verdict or deprived the defendant of a fair trial. United States v. Hoac, 990 F.2d 1099, 1108-9 (9th Cir.1992); United States v. Young, 470 U.S. 1, 16-17.
 
 
 38
 In Gomez-Gallardo, the government called an alleged coconspirator of the defendant to testify, then based its case for guilt on otherwise inadmissible evidence brought to impeach its own witness. Here, the government did not base its case on the impeachment evidence alone but introduced sufficient admissible evidence of guilt and sanity. Thus, the government's "impeachment" of Dr. Nuernberger did not undermine the "fairness, integrity and public reputation of judicial proceedings" as in Gomez-Gallardo. Gomez-Gallardo, 915 F.2d at 556. Because the error more likely than not had no material effect on the verdict, it was harmless. Chu, 935 F.2d at 994.
 
 
 39
 3. Did the district court err in denying Furutani's motion
 
 
 40
 for judgment of acquittal, as to the kidnapping
 
 
 41
 counts, because there was not sufficient
 
 
 42
 evidence to support all
 
 
 43
 elements of the offense?
 
 
 44
 Because the asserted error is in application of the law, we review de novo. Anderson v. United States, 966 F.2d 487, 489 (9th Cir.1992).
 
 
 45
 Furutani argues that 18 U.S.C. Sec. 1201 requires that a kidnapper act "for ransom, reward or otherwise," and the government failed to prove a motive. We have held that when Congress added "or otherwise" to the statute it removed motive as an element of kidnapping. Gawne v. United States, 409 F.2d 1399, 1403 (9th Cir.1969), cert. denied 397 U.S. 943 (1970). See also 18 U.S.C. Sec. 1201. Furutani does not dispute that the government offered sufficient evidence on the other elements of kidnapping. Therefore, the district court did not err in denying Furutani's motion for judgment of acquittal.
 
 
 46
 4. Did the district court err in enhancing Furutani's
 
 
 47
 sentence for facilitation of another offense under U.S.S.G.
 
 
 48
 Sec. 2A4.1(b)(5), because that enhancement was eliminated by
 
 
 49
 the 11/1/91 amendments to the Guidelines?
 
 
 50
 The legality of a sentence is reviewed de novo. United States v. Fine, 975 F.2d 596, 599 (9th Cir.1992) (en banc).
 
 
 51
 The government concedes that the district court erred when it enhanced Furutani's offense level for kidnapping to facilitate another offense (aggravated assault). The district court must apply the Sentencing Guidelines in effect on the date of sentencing. 18 U.S.C. Sec. 3553(a)(4)-(5); United States v. Madera-Gallegos, 945 F.2d 264, 266 n. 1 (9th Cir.1991). Therefore, when Furutani was sentenced on January 17, 1992 his sentence should have complied with the Guidelines as amended on November 1, 1991, under which the base offense level does not increase when a defendant kidnaps to facilitate an aggravated assault. U.S.S.G. Sec. 2A4.1(b)(7) (1991). All parties carried forward an error made initially by the probation department. Because the Guidelines were incorrectly applied, we must remand the case for resentencing. United States v. Rodriguez-Razo, 962 F.2d 1418, 1424 (9th Cir.1992); 18 U.S.C. Sec. 3742(a).
 
 
 52
 5. Did the district court err in departing upward from
 
 
 53
 the Guidelines sentencing range?
 
 
 54
 The legality of a sentence is reviewed de novo. Fine, 975 F.2d at 599. In reviewing departures from the Guidelines we first determine if the district court explained the reasons for both the direction and degree of its departure in sufficiently specific language to allow meaningful review. United States v. Lira-Barraza, 941 F.2d 745, 751 (9th Cir.1991) (en banc). We review sentences on the basis of actual articulated reasons and not a search through the record for permissible reasons. United States v. Montenegro-Rojo, 908 F.2d 425, 428 (9th Cir.1990). We then review departures from the Sentencing Guidelines under a three-step analysis: (1) We determine de novo whether the district court had authority to depart upwards by determining whether the Sentencing Commission adequately considered an aggravating circumstance in formulating the Guidelines; (2) we review the factual finding supporting the aggravating circumstance for "clear error"; and (3) we review the reasonableness of the departure "in light of the structure, standards and policies of the Act and Guidelines." Lira-Barraza, 941 F.2d at 746-47.
 
 
 55
 a. Did the district court err in making an upward departure
 
 
 56
 for extreme psychological injury, pursuant to
 
 
 57
 U.S.S.G. Sec. 5K2.3?
 
 
 58
 Because the Sentencing Guideline for kidnapping does not allow an adjustment for extreme psychological injury to kidnapping victims, the district court had the authority to depart upward if the victims suffered much more psychological injury than normally results from the offense, and if the victims were impaired for an extended period of time. U.S.S.G. Sec. 2A4.1, U.S.S.G. Sec. 5K2.3, Policy Statement (1991).
 
 
 59
 The Ninth Circuit has recently clarified the factual basis required for a Sec. 5K2.3 departure in United States v. Luscier, 983 F.2d 1507, 1513 (9th Cir. 1993). In Luscier, a victim of aggravated assault required counseling, moved from her home, and feared the dark and being alone. Because the only testimony regarding her psychological injury indicated that her symptoms comprised a normal reaction to the crime, the court found an upward departure for extreme psychological injury clearly erroneous. Id. The court held such a departure warranted only when a victim suffered "unusually grave psychological injury" much more serious than normally resulting from the type of offense charged. Id.
 
 
 60
 In applying the Sec. 5K2.3 departure to Furutani, the district court found that Ms. Nugent suffered from post traumatic stress and would likely be impaired for the rest of her life, or at least an extended period of time. Luscier had not yet been decided and the district court, without the benefit of that decision, did not make a finding that Ms. Nugent's psychological injury was much more serious than that normally resulting from a kidnapping and aggravated assault. On remand, in considering the Sec. 5K2.3 departure, the court shall view the evidence of Ms. Nugent's psychological injuries in light of the teachings of Luscier.
 
 
 61
 SO ORDERED.
 
 
 62
 Because the district court did not explain the application of this departure to counts III and IV (relating to Scott Tomchek), departure on those counts was in error.
 
 
 63
 b. Did the district court err in departing upward for
 
 
 64
 Furutani's extreme conduct pursuant to U.S.S.G. Sec. 5K2.8?
 
 
 65
 Because the Sentencing Guideline for kidnapping does not allow an adjustment for unusually cruel, degrading, and humiliating actions, the district court had the authority to depart upward for extreme conduct. U.S.S.G. Sec. 2A4.1, U.S.S.G. Sec. 5K2.8, policy statement.
 
 
 66
 The district court adequately explained the upward direction of the departure based on a finding that Furutani terrorized the victim with a knife at her throat and humiliated her by forcing her to disrobe. We do not find the underlying factual finding clearly erroneous. But the district court explained the two-point degree of departure only as "warranted under the extreme conduct." The Presentence Report also does not give reasons for the degree. Therefore, the explanation is not sufficiently specific for meaningful review. Lira-Barraza, 941 F.2d at 751.
 
 
 67
 Because the district court did not explain the application of this departure to counts III and IV (relating to Scott Tomchek), departure on those counts was in error.
 
 
 68
 c. Did the district court err in increasing Furutani's
 
 
 69
 criminal history based on a prior murder conviction?
 
 
 70
 The Sentencing Guidelines mandate an increase in an offender's criminal history category if he was incarcerated for a prior felony at any time during the fifteen years before the current offense. U.S.S.G. Sec. 4A1.2(e)(1) (1991). Furutani's imprisonment on his prior murder conviction ended fifteen years and two months before the kidnapping. But the district court has authority to depart upwards in sentencing if a remote prior crime was "similar" or if the Guidelines otherwise fail to reflect actual criminal history. U.S.S.G. Sec. 4A1.2, comment n. 8 (1991).
 
 
 71
 The district court explained only that exclusion of the prior conviction failed to reflect Furutani's criminal history, and concluded that his history resembled that of a category III criminal. Although either the similarity of the two crimes or the danger of repetition could justify the departure, the court never stated these reasons. The Presentence Report, adopted by the district court, recommended that the district court impose a sentence at the maximum of the category II range because of the prior conviction, but did not recommend further upward departure. Therefore the record does not contain sufficiently explicit reasons to allow meaningful review. Lira-Barraza, 941 F.2d at 751.
 
 
 72
 III. Resentencing on Revocation of Probation for 1988 Felon-In-Possession Conviction, 92-30061.
 
 A. Procedural Background
 
 73
 Furutani received his original 60-month sentence for being a felon in possession of a firearm on October 7, 1988, during the window between the decisions in Gubienso-Ortiz v. Kanahale, 857 F.2d 1245 (9th Cir.1988), vacated, United States v. Chavez-Sanchez, 109 S.Ct. 859 (1989) and Mistretta v. United States, 488 U.S. 361 (1989), when the Sentencing Guidelines were considered unconstitutional in the Ninth Circuit. After his conviction for kidnapping, the district court revoked his probation and conducted a resentencing hearing. Because at the 1992 resentencing the court and the parties mistakenly believed that the original 1988 sentencing took place before the Guidelines came into effect, the court imposed a new sentence at the statutory maximum of 60 months. Furutani appeals the sentence as an unwarranted departure from the Guidelines.
 
 
 74
 B. Discussion: did Furutani waive his objections to his resentencing on revocation of probation by failing to object at the time of his original sentencing?
 
 
 75
 We review de novo the application of the Sentencing Guidelines. Fine, 975 F.2d at 599.
 
 
 76
 When Furutani received his 1988 sentence, we had held the Guidelines unconstitutional. Gubienso-Ortiz, 857 F.2d 1245. However, the Supreme Court later declared the Guidelines constitutional and applied them retroactively to the window in time when Gubienso-Ortiz was in effect. Mistretta, 488 U.S. 361.
 
 
 77
 When the district court revokes parole, on resentencing it may impose only a sentence that would be available at the original sentencing. United States v. White, 925 F.2d 284, 286 (9th Cir.1991); 18 U.S.C. Sec. 3565. The government concedes that the Guidelines retroactively apply to the 1988 sentence.
 
 
 78
 However, the government argues that Furutani failed to insist on a Guidelines sentence in 1992 because the statutory option of straight parole was more lenient than the Guidelines' minimum of two to eight months in prison. Therefore, the government argues, he waived the right to application of the Guidelines on resentencing.
 
 
 79
 The argument is without merit. First, the government offers no authority for the proposition that if a defendant does not insist on a Guidelines sentence the district court may avoid the Guidelines. Further, we recognize an express waiver of the statutory right to appeal a sentence only when the waiver is knowing and voluntary. United States v. Navarro-Botello, 912 F.2d 318, 321 (9th Cir.1990). The government does not explain how Furutani's "silence" satisfies those requirements. Even if such a waiver were possible, the record shows that Furutani was not silent. Rather, he asked the court to consider the Guidelines although they did not (he thought) apply.
 
 
 80
 When the Guidelines are incorrectly applied, we must remand the case unless the government shows that the error did not affect the sentence; the government has not done so. Rodriguez-Razo, 962 F.2d at 924, 18 U.S.C. Sec. 3742(a). The resentencing must therefore be vacated and the case remanded for sentencing under the Guidelines.
 
 
 81
 As Furutani points out, on resentencing, the district court may only consider the aggravating and mitigating circumstances present on October 7, 1988. However, the district court may revisit those circumstances and weigh them in the light of Furutani's later conduct. White, 925 F.2d at 287.
 
 IV. Conclusion
 A. 92-30071
 
 82
 Furutani's conviction for kidnapping and aggravated assault is AFFIRMED. The sentence is VACATED and the case is REMANDED for resentencing.
 
 B. 92-30061
 
 83
 Furutani's resentencing after violation of probation for being a felon in possession of a firearm is VACATED and the case is REMANDED for resentencing.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Fed.R.Evid. 704 provides:
 Rule 704. Opinion on Ultimate Issue
 (a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.
 (b) No expert testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are for the trier of fact alone.
 The government argues that Furutani presented Nuernberger as a percipient witness, and that as a non-expert 704(b) does not apply to his testimony. Rather, the government argues, 704(a), which broadly admits ultimate-opinion testimony by non-experts, applies. But the Advisory Committee wrote that Rules 701 and 702, which lay out a general rule that only "helpful" opinions are admissible, "stand ready to exclude opinions phrased in unexplored legal criteria." Fed.R.Evid. 704(a) advisory committee's note. Because Dr. Nuernberger's opinion "not [insane] in this state" relies on unexplored legal criteria, Rules 701 and 702 would exclude it irrespective of his status as an expert. Id.