**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellee*,

v.

MAX SPATIG, AKA John Spatig,
AKA John Serge Spatig,
　　　　　　*Defendant-Appellant.*

No. 15-30322

D.C. No.
4:12-cr-00302-
WYD-1

OPINION

Appeal from the United States District Court
for the District of Idaho
Wiley Y. Daniel, Senior District Judge, Presiding

Argued and Submitted July 12, 2017
Seattle, Washington

Filed September 13, 2017

Before: Michael R. Murphy,* M. Margaret McKeown,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge McKeown

---

　*The Honorable Michael R. Murphy, United States Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

## SUMMARY**

### Criminal Law

The panel affirmed the defendant's jury conviction and sentence for storage of hazardous waste in violation of the Resource Conservation and Recovery Act.

The panel held that the district court properly refused to allow evidence of the defendant's diminished capacity because the crime was one of general intent.

The district court also did not err in applying a four-level sentence enhancement under U.S.S.G. § 2Q1.2(b)(3) for cleanup that required a substantial expenditure.

### COUNSEL

Steven V. Richert (argued), Federal Defender Services of Idaho, Pocatello, Idaho, for Defendant-Appellant.

Emily Anne Polachek (argued), Adam C. Cullman, Allen M. Brabender, and Aaron P. Avila, Attorneys; John C. Cruden, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Michael J. Fica, Assistant United States Attorney, United States Attorney's Office, Pocatello, Idaho; for Plaintiff-Appellee.

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## OPINION

McKEOWN, Circuit Judge:

As the saying goes, fences make good neighbors. But when the neighbor collects thousands of containers of hazardous and combustible chemicals in his yard that could explode at any moment, a fence may not be enough to save the neighborly relationship. Instead, the authorities need to get involved.

Max Spatig was charged and convicted under the Resource Conservation and Recovery Act ("RCRA") for storing more than 3,000 containers of hazardous waste in his yard without a permit. On appeal, Spatig challenges the district court's refusal to allow evidence of his diminished capacity, arguing that his crime is one of specific, as opposed to general, intent. He also objects to the district court's application of a four-level sentence enhancement based on the magnitude of the expenditure required to clean up his yard. We affirm.

## Background

Idaho resident Spatig has dealt with the storage of paint for much of his adult life. For over fifteen years, he ran MS Enterprises, a business that resurfaced cement floors. As part of his work with the company, Spatig purchased discounted paint in bulk and accumulated large quantities of paint and paint-related materials. When his wife fell ill, Spatig stopped working and decided to store the materials on his residential property in Menan, Idaho. Neither he nor MS Enterprises applied for or obtained a hazardous waste permit from the state environmental agency or the Environmental Protection Agency ("EPA") to store the materials.

Investigating a nuisance complaint in 2005, county officials discovered Spatig's storage of paint and paint-related materials.  Due to concerns about hazardous waste, the Idaho Department of Environmental Quality ("DEQ") was called in and determined it was necessary to conduct a cleanup.  Inspectors worked with Spatig to identify which containers were acceptable for removal from the property.  Spatig was allowed to keep a small portion, but most containers were collected and destroyed by DEQ.

Unfortunately, the 2005 run-in with authorities did not change Spatig's behavior.  In 2010, after receiving nuisance complaints about the condition of Spatig's property in Rexburg, Idaho, a detective from the county sheriff's office observed canisters haphazardly strewn across the property, many of which were in poor condition and labeled as flammable or corrosive.  As one witness described at trial, Spatig's yard was an "indescribable mess," with piles of corroded and rusting containers left in the yard or packed into vehicles and trailers.  Neither the local fire department nor the regional hazmat team could handle a cleanup of that size or complexity.  Idaho turned to the EPA for help.

The EPA sent a special team from Washington State to run the cleanup.  At times dressed in chemical protective suits and respirators, the team separated the materials based on their contents, marked the containers, and sent samples to a lab for testing.  Testing confirmed that the substances were either flammable or corrosive enough to be considered hazardous under EPA regulations.  Over about two weeks, the EPA removed approximately 3,400 containers from Spatig's property and spent $498,562 on the cleanup.

The EPA pursued criminal charges against Spatig under RCRA.  Spatig was indicted on one count of "knowingly stor[ing] and dispos[ing] of hazardous waste, namely

ignitable and corrosive hazardous waste, on property in Rexburg, Idaho, without a permit" from the EPA or DEQ, a crime under 42 U.S.C. § 6928(d)(2)(A).

The proceedings and trial focused on whether Spatig had the requisite mental state—i.e., "knowingly"—to commit the offense. Spatig sought to introduce evidence of his diminished capacity, but the government filed a motion in limine to exclude the evidence. The district court concluded that diminished capacity evidence is admissible only for specific-intent crimes and that § 6928(d)(2)(A) is a general-intent crime. The jury convicted Spatig of the single count under § 6928(d)(2)(A), and the district court sentenced him to 46 months.

## Analysis

### I. Section 6928(d)(2)(A) Is a General-Intent Crime

The key issue on appeal is whether § 6928(d)(2)(A) defines a crime of general or specific intent, as that decision dictates whether Spatig can advance a diminished-capacity defense. We have consistently held that "diminished capacity defenses are not available to defendants who are accused of general intent crimes." *United States v. Szabo*, 760 F.3d 997, 1001 n.2 (9th Cir. 2014) (citing *United States v. Vela*, 624 F.3d 1148, 1154 (9th Cir. 2010)); *United States v. Acosta-Sierra*, 690 F.3d 1111, 1124 (9th Cir. 2012); *United States v. Smith*, 638 F.2d 131, 132 (9th Cir. 1981). Reviewing de novo the district court's decision to preclude Spatig's defense, *United States v. Ross*, 206 F.3d 896, 898–99 (9th Cir. 2000), we affirm because § 6928(d)(2)(A) defines a general-intent crime.

Section 6928(d)(2)(A) criminalizes "*knowingly* treat[ing], stor[ing], or dispos[ing] of any hazardous waste

. . . without a permit." (Emphasis added.) "Knowingly" is not a novel or unusual term in criminal statutes. The Supreme Court teaches that the statutory term "knowingly" "merely requires proof of knowledge of the facts that constitute the offense." *Bryan v. United States*, 524 U.S. 184, 193 (1998). In the same vein, we have held that the term "knowingly" "normally signifies a requirement of general, not specific, intent."[1] *United States v. Sneezer*, 900 F.2d 177, 179 (9th Cir. 1990). That is, under § 6928(d)(2)(A), the prosecution is not required to prove that Spatig intended a particular purpose or objective, as would be required for a specific-intent crime. *See Bryan*, 524 U.S. at 192 (noting that "knowingly" does not necessarily have "any reference to a culpable state of mind"). Instead, the statute sets out a criminal act—treatment, storage, or disposal of hazardous waste—and provides that that act be performed with the mental state of knowledge.

Our earlier cases paint § 6928(d)(2)(A) as a general-intent crime, albeit without use of the term. For example, in *United States v. Hoflin*, we rejected Hoflin's claim that § 6928(d)(2)(A) "requires proof that he knew there was no permit for disposal." 880 F.2d 1033, 1034 (9th Cir. 1989), *cert denied* 493 U.S. 1083 (1990). Instead, we construed the

---

[1] Black's Law Dictionary provides guidance about the difference between general and specific intent. At the time § 6928(d)(2)(A) was passed, the dictionary observed that the "most common usage of 'specific intent' is to designate a special mental element which is required above and beyond any mental state required with respect to the *actus reus* of the crime." *Specific Intent*, Black's Law Dictionary (6th ed. 1990). Currently, it interprets "specific intent" as "[t]he intent to accomplish the precise criminal act that one is later charged with." *Specific Intent*, Black's Law Dictionary (10th ed. 2014). These definitions boil down to the same principle: specific intent means that the defendant acted with a particular purpose or objective.

term "knowingly" as requiring that a defendant be aware that he is treating, storing, or disposing of something that he knows is hazardous waste. *Id.* at 1039. Our construction gives no indication that the defendant must act with a particular purpose or objective. Additionally, in holding that "[n]othing in the language of [§ 6928(d)(1)] requires the Government to prove that the defendants had the knowledge that their acts were unlawful," we have implicitly rejected the argument that similar RCRA statutes require proof of a specific intent to violate the law. *United States v. Fiorillo*, 186 F.3d 1136, 1156 (9th Cir. 1999) (per curiam).

Comparing the text of § 6928(d)(2)(A) to the Model Penal Code, an accepted signpost to measure and understand intent elements, further reinforces that the statute is a general-intent crime. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 444 (1978). The Code lists four mental states—purposely, knowingly, recklessly, and negligently—and we have explained that, as a general matter, "'purpose' corresponds to the concept of specific intent, while 'knowledge' corresponds to general intent." *United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1196 (9th Cir. 2000). The Model Penal Code had been published nearly fifteen years before 1976, when Congress enacted § 6928(d)(2)(A) and explicitly invoked the "knowingly" language that signals general intent. *See* Model Penal Code § 2.02 (1962).

RCRA is a classic environmental public-welfare statute whose "overriding concern" is "the grave danger to people and the environment from hazardous wastes." *Hoflin*, 880 F.2d at 1038. Thus, § 6928(d)(2)(A) fits within a class of general-intent crimes that protect public health, safety, and welfare. For these crimes, a less-exacting mental state is justified by the particularly strong countervailing interest in protecting the public at large and the defendant's likely

awareness that his actions are regulated. *See United States v. Int'l Minerals & Chems. Corp.*, 402 U.S. 558, 565 (1971); *United States v. Freed*, 401 U.S. 601, 607 (1971). Public-welfare statutes that regulate harmful devices or hazardous waste are particularly likely to be deemed general-intent statutes. *See United States v. Weitzenhoff*, 35 F.3d 1275, 1284–85 (9th Cir. 1993) (collecting cases). For example, we have previously construed "knowingly" in 33 U.S.C. § 1319(c)(2) of the Clean Water Act, which regulates discharging pollutants into navigable waters without a permit, as requiring that the prosecution prove only that the defendant "knowingly engage[d] in conduct that results in a . . . violation"—as opposed to establishing that the defendant acted with knowledge that his actions were illegal. *Weitzenhoff*, 35 F.3d at 1284.

Spatig urges that *United States v. Twine*, 853 F.2d 676 (9th Cir. 1988), demands a contrary result. We disagree. In *Twine*, the Ninth Circuit reviewed convictions under 18 U.S.C. § 875(c)—which prohibits "transmit[ting] . . . any communication containing any threat to kidnap any person or any threat to injure the person of another"—and its near twin § 876—which prohibits "knowingly . . . caus[ing] to be delivered . . . any communications . . . containing any threat to kidnap any person or any threat to injure the person of the addressee or of another." Relying on precedent interpreting those provisions, we construed both provisions as requiring an "intent to threaten" and held that "the showing of an intent to threaten, required by §§ 875(c) and 876, is a showing of specific intent." *Twine*, 853 F.2d at 680.

Important here, *Twine* held that §§ 875(c) and 876 are specific-intent crimes precisely because both sections include an "intent to threaten" element. *See* 853 F.2d at 680. By reading an "intent to threaten" element into the statute,

the court considered those statutory sections akin to "classic" specific-intent crimes, where the crime expressly mandates that the defendant acted with a particular purpose or objective. In contrast, the RCRA provision at issue here, § 6928(d)(2)(A), does not explicitly or implicitly contain such an intent element. Rather, the statute is agnostic to the defendant's aim and, for that very reason, defines a general-intent crime. In any event, we have softened on the reasoning in *Twine*; one year after its publication, we explicitly declined to read an intent element into 18 U.S.C. § 876. *United States v. Davis*, 876 F.2d 71, 73 (9th Cir. 1989) (per curiam).[2]

Because § 6928(d)(2)(A) describes a crime of general intent, the district court did not err in excluding evidence of Spatig's diminished capacity.

## II. The Cleanup Costs Constituted a "Substantial Expenditure"

At sentencing, the district court applied a four-level enhancement under U.S.S.G. § 2Q1.2(b)(3) because the cleanup of the property "required a substantial expenditure" given the magnitude of the hazardous materials in Spatig's yard and the cost of $498,562 to clean them up.[3] The district

---

[2] The court in *Davis* is not alone; every other circuit to consider the issue has rejected *Twine*'s reasoning. *See United States v. Nicklas*, 713 F.3d 435, 439 & n.3 (8th Cir. 2013) (following the rule adopted by the First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Tenth Circuits that the government must "prove [only that] a defendant acted knowingly in transmitting a communication containing a threat to injure" and recognizing the Ninth Circuit as the sole outlier).

[3] The district court determined that Spatig's guideline offense level was 16 and his criminal history category was VI. Spatig's sentence of 46 months is at the bottom of his guidelines range of 46 to 57 months.

court did not abuse its discretion in applying this enhancement.

Subsection 2Q1.2(b)(3) states: "If the offense resulted in disruption of public utilities or evacuation of a community, or *if cleanup required a substantial expenditure*, increase by 4 levels." U.S.S.G. § 2Q1.2(b)(3) (emphasis added). The subsection does not define "substantial expenditure," nor does its application note, which simply adds that "[s]ubsection (b)(3) provides an enhancement where a public disruption, evacuation or *cleanup at substantial expense has been required*. Depending upon the nature of the contamination involved, a departure of up to two levels either upward or downward could be warranted." *Id.* cmt. n.7 (emphasis added).

Although the guidelines do not delineate when an expenditure becomes "substantial," our case law provides guidance. *See United States v. Merino*, 190 F.3d 956 (9th Cir. 1999). In *Merino*, we noted that "substantial expenditure" is listed in the guideline next to two severe circumstances—public utilities disruption and evacuation—and so must have a similarly serious impact on the community. *Id.* at 958. That limitation also avoids sweeping in every garden-variety spill; "[a]t the least," a substantial expenditure "should be much greater in economic impact than the run-of-the-mill contamination." *Id.* On that basis, we held that the cleanup cost of $32,000 was not a substantial expenditure. *Id.* at 958–59.

As the district court pointed out, the $498,562 at issue here far exceeds the $32,000 in *Merino*—in fact, it is more than an order of magnitude larger. Spatig responds that $498,562 cannot be "substantial" based on the statement in *Merino* that the defendant "cite[d] a number of cases to show that environmental cleanups are commonly in the six or

seven figure range." *Id.* at 958. Simply because cleanups spawn costs in this range does not mean that they cannot be characterized as "substantial"; nothing in *Merino* purports to establish a hard-and-fast rule about the cutoff for a qualifying expenditure. Instead, we sensibly noted that if $32,000 were "substantial" for the purposes of the sentencing adjustment, it is hard to imagine a storage violation that would not require the enhancement. *See id.* at 958–59.

While we do not purport to establish a bright-line rule between substantial and insubstantial expenditures, we note that our sister circuits have determined that expenditures of $200,000 or less count as "substantial." *See United States v. Chau*, 293 F.3d 96, 100 (3d Cir. 2002) (holding that $200,000 is a substantial expenditure and noting that even $58,000 is substantial); *United States v. Cunningham*, 194 F.3d 1186, 1202 (11th Cir. 1999) (concluding that a $147,716.66 expenditure was substantial, even in the face of the "relative simplicity of the technique" for cleanup); *United States v. Bogas*, 920 F.2d 363, 369 (6th Cir. 1990) (reversing as clear error the district court's determination that a six-figure cleanup—roughly $100,000—was not substantial). The $498,562 figure underestimates the total cleanup cost because it only reflects the amount spent by the EPA; it does not include the resources expended by the local and regional hazmat teams in addressing the containers in Spatig's yard. Under these specific circumstances, the district court did not abuse its discretion in characterizing the costs as a "substantial expenditure."

**AFFIRMED.**