**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**James Peter DARBY, Defendant–
Appellant.**

**No. 93–5551.**

United States Court of Appeals,
Fourth Circuit.

Argued July 20, 1994.

Decided Oct. 21, 1994.

---

**ARGUED:** J. Matthew Martin, Harry C. Martin, Sr., Martin & Martin, P.A., Hillsborough, NC, for appellant. Douglas Cannon, Asst. U.S. Atty., Greensboro, NC, for appellee. **ON BRIEF:** Benjamin H. White, Jr., U.S. Atty., Greensboro, NC, for appellee.

Before LUTTIG and WILLIAMS, Circuit Judges, and ANDERSON, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by published opinion. Judge JOSEPH F. ANDERSON, Jr., wrote the opinion, in which Judge LUTTIG and Judge WILLIAMS joined.

## OPINION

JOSEPH F. ANDERSON, Jr., District Judge:

James Peter Darby was convicted on March 31, 1993 after a jury trial in the Middle District of North Carolina for transmitting a threatening communication in interstate commerce in violation of 18 U.S.C. § 875(c). The district judge sentenced Darby on June 22, 1993 to a term of imprison-

ment of forty months, three years of supervised release, a fine of $3,000.00, and a special assessment of $50.00. Darby appeals both his conviction and the sentence imposed thereon. For the reasons set forth below, we affirm.

I

In the summer of 1992, the Internal Revenue Service (IRS) sent Darby an appointment letter indicating that his 1989 income tax return was to be the subject of an audit. At that time, Darby lived in Hillsborough, North Carolina, but was working on a computer consulting project in Rochester, New York. On August 4, 1992, Darby responded to the IRS's notice by telephoning the IRS office in Durham, North Carolina. Jerry McKnight, the supervisor of the examination division of the Durham IRS office, testified that Darby was uncooperative about scheduling the pending audit. Specifically, Darby rejected several proposed dates and refused to produce his original tax records, which were located in Colorado.

Because Darby would not make himself available to appear at the audit, the IRS performed the audit in his absence and without his input. The audit revealed that Darby owed penalties and interest for improper deductions in 1989.

On September 17, 1992, approximately two weeks after Darby returned from Rochester to his home in Hillsborough, he received a letter from the IRS stating that he had been audited in his absence and that he owed over $10,000 on his 1989 return. Darby became extremely upset at this revelation and promptly made several telephone calls to the Durham office of the IRS.

Durham IRS employee Annette Miller summarized a call she received from Darby as follows:

He said that he was real upset about the report that was sent out to him. And I was telling him, "Sir, will you please calm down," because he was using a lot of profanity. So, I asked him, I said—He said, "Do you"—"Ma'am, do you know how long it takes to bury a person?" . . .

"Do you know how long it takes to kill a person?" . . .

Then he said, "I am tired of the IRS with their G** d*mn bullsh**. If I don't hear from you today, it's going to be a massacre." And then he asked me, do I know what "a massacre" means. . . .

After that, he said that he normally don't threaten anyone, but when—he was in Viet Nam; but he would kill again. Then he said, "At 3:00 o'clock, if I don't hear from my manager," we might as well vacate the premises. . . .

Letitia Thompson, another IRS employee in the Durham office, also received a call from Darby on September 17, 1992. Darby asked to speak to Mr. McKnight, the supervisor in that office, but when Ms. Thompson attempted to transfer Darby to Mr. McKnight, she apparently had some trouble with the phone system, and Darby's calls were cut off several times. Ms. Thompson testified as follows: "On the fourth call Mr. Darby said that he wasn't upset with me; but that he had went [sic] to the hardware store, and gotten all that they had, and everything that he needed to make a strong explosive." At that moment, Ms. Thompson summoned IRS criminal investigator Theresa Carson to the phone and handed the receiver to her. Ms. Carson testified that when she picked up the phone, she heard, "How would you like to have a pipe bomb delivered to your place of employment? This is not a bomb threat."

Later that afternoon, Darby called the toll-free, "1–800" number for the IRS Problem Resolution Office, which number he had found in the yellow pages of his Hillsborough phone book. Jennifer Morrison, an IRS taxpayer service representative, answered Darby's call in Nashville, Tennessee. This interstate call is the subject of Darby's conviction presently under review by this court. Ms. Morrison testified about the substance of Darby's threats:

He said that he had a bill now from Greensboro, from an auditor, Ms. Mary Harris, and that he—the bill said he owed $10,833, and he didn't agree with that. He then—at that point he said that if he could

get his hands on Mary Harris, her "life expectancy would be zip." ...

.... And then he asked if I knew the policy of the Adolph Hitler School. I said no. And he stated that it was the same as the IRS, get the guilty bastard in here.

And then he asked if I knew who Jeffrey Dahlmer [sic] was, and I said yes. He said that—Mr. Darby said that he didn't eat his victims, like Jeffrey Dahlmer; [sic] that he just killed them by blowing them up. And he also asked if I had seen the little Somalia children on TV that were dying, because the Internal Revenue Service may be the next Somalia. And he asked if we had a flower fund, and he said that we would need one for all of the funerals in Durham.

And at this point I told him that I was going to refer his case to our problem resolution office, he should have a contact back within a few days.

He said if it's going to be a few days, never mind, that it would be too late, people in Durham would be dead. He said, "Do you understand?" I said yes.

Ms. Morrison testified that she was shocked and frightened by the call from Darby.

Thereafter, the police were summoned to the IRS office in Durham. The employees were evacuated while the building was searched for a bomb, and many employees were eventually sent home.

Mr. McKnight made a recorded call to Darby late that same afternoon in an effort to verify Darby's intent in making the threatening phone calls. Darby stated that he had gone to the local farm supply and hardware store earlier that afternoon and had purchased materials which, if properly assembled, "would constitute a bomb." Darby made it apparent that he intended to assemble a bomb and use it against the IRS office if he did not get satisfaction. He also acknowledged telling other IRS employees during earlier calls that "it might not be a good idea to ... continue ... coming to work there."

The next day, September 18, 1992, IRS investigators arrested Darby in his home in Hillsborough pursuant to an arrest warrant. Upon Darby's arrest, the IRS investigators and several agents from the Bureau of Alcohol, Tobacco, and Firearms searched Darby's house and car. In Darby's house the investigators found two five-foot lengths of plastic PVC pipe, four PVC plastic end caps, PVC cement, two electrical switches, two bags of sulphur, a bottle of malathion, receipts indicating the purchase of those items in Hillsborough on September 17, 1992, and a jigsaw. At trial, experts for both parties testified that these items, if combined with a couple of other ingredients, could be used to make a pipe bomb.

On November 30, 1992, a federal grand jury for the Middle District of North Carolina returned a one-count indictment against Darby, charging him with transmitting a threatening communication in interstate commerce in violation of 18 U.S.C. § 875(c). Darby was tried for that offense before a jury in Greensboro, North Carolina beginning on March 29, 1993. After the jury was selected, the Defendant filed a written motion to dismiss the indictment because, he alleged, the indictment was defective. The court denied the Defendant's motion, and the trial proceeded. As stated previously, the jury returned a guilty verdict on March 31, 1993, and Darby was sentenced on June 22, 1993.

Darby raises several issues on appeal with regard to both his conviction and his sentence. We address those issues seriatim.

## II

Darby first argues that the district court erred in refusing to dismiss the indictment as facially defective because, he argues, the indictment failed to include all of the elements of the offense charged. Specifically, Darby asserts that 18 U.S.C. § 875(c) requires a showing of specific intent to threaten and that, because the indictment does not charge specific intent, it is invalid. We do not accept the Appellant's argument.

Whether an indictment properly charges an offense is a matter of law which we may consider *de novo* if the defendant makes a timely objection to the indictment. In reviewing the sufficiency of the indictment

in this case, we apply a heightened scrutiny because the Appellant challenged the sufficiency of the indictment prior to the verdict. *See United States v. Hooker*, 841 F.2d 1225, 1229 (4th Cir.1988) (en banc); *cf. Finn v. United States*, 256 F.2d 304, 307 (4th Cir. 1958) (" 'Indictments and informations are construed more liberally after verdict than before....' ").

■ As we have previously recognized, "[a]n indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense." *United States v. Daniels*, 973 F.2d 272, 274 (4th Cir.1992) (citing *Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962)), *cert. denied*, — U.S. —, 113 S.Ct. 1064, 122 L.Ed.2d 369 (1993). Moreover, the indictment must include every essential element of an offense, or else the indictment is invalid; and mere reference to the applicable statute does not cure the defect. *Id.* at 274; *Hooker*, 841 F.2d at 1228; *United States v. Pupo*, 841 F.2d 1235, 1239 (4th Cir.) (en banc), *cert. denied*, 488 U.S. 842, 109 S.Ct. 113, 102 L.Ed.2d 87 (1988). These criteria ensure that a defendant is afforded his constitutional guarantees under the Fifth Amendment, which provides that a defendant cannot be prosecuted for a capital or infamous crime[1] except on presentment or indictment of a grand jury, and under the Sixth Amendment, which provides "that a defendant must 'be informed of the nature and cause of the accusation' against him." *Daniels*, 973 F.2d at 274.

At oral argument, Appellant's counsel readily conceded that prior to the trial in this case, the Appellant was fully aware of the charges brought against him. Furthermore, we have no doubt that this indictment would be sufficient to protect the Appellant from double jeopardy for the conduct alleged. The essence of Appellant's argument is that the indictment fails to recite an essential element of the offense—namely, specific intent to threaten.

The indictment in this case charged the Appellant as follows:

On or about September 17, 1992, JAMES PETER DARBY, did willfully and knowingly transmit in interstate commerce from Orange County, in the State and Middle District of North Carolina, to Nashville, Tennessee, a telephone communication to Jennifer Gillham,[2] which telephone communication contained a threat to injure the employees of the Internal Revenue Service office in Durham, North Carolina, that is, "he does not eat his victims, he just kills them and blows them up; the Internal Revenue Service people in Durham would be dead; and if the Internal Revenue Service had a flower fund, they would need one for the funerals in Durham"; in violation of Title 18, United States Code, Section 875(c).

(J.A. 9). The indictment basically tracks the language of section 875(c), which provides: "Whoever transmits in interstate or foreign commerce any communication containing ... any threat to injure the person of another, shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U.S.C. § 875(c). Although section 875(c) contains no explicit mens rea element, the statute is not presumed to establish a strict liability offense, because the "mere omission from [the statute] of any mention of intent will not be construed as eliminating that element from the crimes denounced." *Morissette v. United States*, 342 U.S. 246, 263, 72 S.Ct. 240, 250, 96 L.Ed. 288 (1952).

We recognize that there is a split among the circuits as to whether section 875(c) is a specific intent crime or a general intent crime. One line of authority holds that a conviction under section 875(c) requires specific intent to threaten. *E.g., United States v. Twine*, 853 F.2d 676 (9th Cir.1988). In other words, these cases require the govern-

---

[1]. An "infamous crime" within the meaning of the Fifth Amendment is generally one punishable by imprisonment in a penitentiary, *i.e.*, a crime punishable by imprisonment exceeding one year. *Green v. United States*, 356 U.S. 165, 183, (1958).

[2]. Jennifer Gillham is now Jennifer Gillham Morrison.

ment to prove, beyond a reasonable doubt, that the defendant intended his communication to be received as a threat.[3] On the other hand, another line of cases holds that section 875(c) is a general intent crime, requiring a showing only that the defendant knowingly transmitted the interstate communication. *United States v. DeAndino*, 958 F.2d 146 (6th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2997, 120 L.Ed.2d 874 (1992). Under this approach, to determine whether the communication is a true threat, one must examine whether a reasonable recipient of the communication would interpret it as a threat. *See id.* at 148.

The Appellant urges this court to adopt the reasoning of the Ninth Circuit in *Twine, supra.* The issue of whether section 875(c) is a crime of general intent or specific intent arose in *Twine* because the defendant there raised the defense of diminished mental capacity. As the court recognized, defenses such as diminished mental capacity and voluntary intoxication[4] are viable only for specific intent crimes, because such defenses directly negate the required intent element of those crimes. *See Twine*, 853 F.2d at 679. The court concluded that specific intent to threaten is a required element under section 875(c). *Id.* at 680.

The *Twine* court relied on an earlier Ninth Circuit opinion, *Seeber v. United States*, 329 F.2d 572 (9th Cir.1964), to support its conclusion that section 875(c) defines a specific intent crime. *Twine*, 853 F.2d at 679–80. However, the *Twine* court may have read too much into *Seeber*, because the court in *Seeber* addressed only whether section 875(c) generally requires a showing of intent, as opposed to being a strict liability offense. The *Seeber* court did not distinguish between specific intent and general intent; the court merely stated that intent was a "vital" element un-

---

**3.** The district judge apparently interpreted the term "specific intent" to require a showing that the Defendant intended to carry out the threat or was capable of carrying out the threat. (*See* J.A. 86). However, in a prosecution under section 875(c), the government need not prove intent (or ability) to carry out the threat. *See United States v. Twine*, 853 F.2d 676, 681 n. 4 (9th Cir.1988); *United States v. Kelner*, 534 F.2d 1020, 1023 (2d Cir.), *cert. denied*, 429 U.S. 1022 (1976); *United States v. Holder*, 302 F.Supp. 296, 300 (D.Mont. 1969), *aff'd per curiam*, 427 F.2d 715 (9th Cir. 1970); *cf. United States v. Chatman*, 584 F.2d 1358, 1361 (4th Cir.1978) ("The only proof of specific intent required to support a conviction under 18 U.S.C. § 876 [mailing a threat through the U.S. mail] is that the defendant knowingly deposits a threatening letter in the mails, not that he intended or was able to carry out the threat."); *United States v. Roberts*, 915 F.2d 889, 890 (4th Cir.1990) (in affirming a conviction under 18 U.S.C. § 115(a)(1)(B)—threatening a United States judge—stating that the defendant "correctly does not contend that the government must prove his intention or present ability actually to carry out the threat"), *cert. denied*, 498 U.S. 1122 (1991). *But cf. United States v. Patillo*, 431 F.2d 293, 297–98 (4th Cir.1970) (holding that "where . . . a true threat against the person of the President is uttered without communication to the President intended, the threat can form a basis for conviction under the terms of [18 U.S.C. § ] 871(a) [threatening the President] only if made with a present intention to do injury to the President"), *aff'd on reh'g en banc*, 438 F.2d 13 (4th Cir.1971).

The district judge's jury instructions in this case actually charged that specific intent is re-

quired for conviction under section 875(c). He charged the jury as follows:

> Before a Defendant may be found guilty of this charge, the Government must prove beyond a reasonable doubt the following facts:
> First: That the Defendant transmitted in interstate commerce a communication *which he knew to contain a threat to injure the person of another*, as charged in the indictment; and Second: That at the time the Defendant transmitted the communication, *he intended that the person who received it would understand it to contain a true and serious threat* to physically injure someone.

(J.A. 312–13) (emphasis added).

Although the district judge charged specific intent as we have defined it under section 875(c), a jury instruction cannot cure the omission from the indictment of an essential element of the offense. *Hooker*, 841 F.2d at 1232. The Fifth Amendment requires a grand jury to examine and find sufficient evidence of every element of the offense listed in the indictment. *Id.* at 1230, 1232. Thus, if this court were to conclude that section 875(c) requires a showing of specific intent, the fact that Darby may have suffered no prejudice as far as being fully aware of the charges against him is of no consequence.

**4.** In the case at bar, there was some evidence that Darby had been drinking on the afternoon that he made the threatening calls for which he was convicted. (*See* J.A. 219). However, he did not contend that he was intoxicated at the time he made the calls. In fact, during the trial, the Appellant's attorney conceded that Darby would not raise the defense of voluntary intoxication. (J.A. 123).

der section 875(c) to ensure that a defendant would not be convicted for an act done through mistake or inadvertence. *Seeber*, 329 F.2d at 577. Certainly, a requirement of general intent would also be sufficient to ensure that a defendant is not convicted for an act that was done because of mistake or inadvertence. *See DeAndino*, 958 F.2d at 149. As the Sixth Circuit recognized in *DeAndino*, "The difference between a specific intent and general intent crime involves the way in which the intent is proved— whether by probing the defendant's subjective state of mind or whether by objectively looking at the defendant's behavior in the totality of the circumstances." *Id.* Whether section 875(c) is a specific intent crime or a general intent crime, the government would still be required to "prove that the threat is a 'real threat' as opposed to a mistake or inadvertent statement." *Id.*

The *Twine* court further supported its holding by drawing an analogy to 18 U.S.C. § 876, which prohibits, *inter alia*, sending threatening communications through the United States mail.[5] The court quoted from *United States v. Sirhan*, 504 F.2d 818, 819 (9th Cir.1974), which stated that "specific intent is required for conviction under [§ 876]." The *Twine* court seems to have read too much into *Sirhan* as well. The court in *Sirhan* addressed specific intent only as it relates to the statute's requirement that the defendant knowingly *deposited* the letter into the mail. *Sirhan*, 504 F.2d at 819. *Sirhan* did not indicate whether the defendant had to intend the letter to be received as a threat.

We have adopted an interpretation of section 876 similar to that of the *Sirhan* court.

In *United States v. Chatman*, 584 F.2d 1358 (4th Cir.1978), this court stated that a conviction under section 876 requires that the defendant knowingly deposited the threatening letter in the mails. *Id.* at 1360–61 (citing *Sirhan*, 504 F.2d at 819). In *Chatman*, we also focused on the act of mailing, not on the act of threatening. We are unwilling to infer a specific intent requirement in section 875(c) from our previous decisions regarding section 876.

In interpreting other statutes that prohibit threatening communications, we have employed an objective standard to determine whether the defendant communicated a true threat. For example, in *United States v. Maisonet*, 484 F.2d 1356 (4th Cir.1973), *cert. denied*, 415 U.S. 933, 94 S.Ct. 1447, 39 L.Ed.2d 491 (1974), this court stated that, in a prosecution under section 876, "[i]f there is substantial evidence that tends to show beyond a reasonable doubt that an ordinary, reasonable recipient who is familiar with the context of the letter would interpret it as a threat of injury, the court should submit the case to the jury." *Id.* at 1358.[6] Similarly, in *United States v. Roberts*, 915 F.2d 889 (4th Cir.1990), *cert. denied*, 498 U.S. 1122, 111 S.Ct. 1079, 112 L.Ed.2d 1184 (1991), we affirmed a conviction under 18 U.S.C. § 115(a)(1)(B) (prohibiting threats against, *inter alia*, United States judges) by focusing on a reasonable recipient's interpretation of the allegedly threatening letter. *See id.* at 890–91.

The Appellant suggests that in *United States v. Dutsch*, 357 F.2d 331 (4th Cir.1966), this court determined that section 875(c) was a specific intent crime. Certainly, in *Dutsch*

---

5. Section 876 is quite similar to section 875(c). The third paragraph of section 876 provides, in part: "Whoever knowingly so deposits or causes to be delivered as aforesaid, any communication ... addressed to any other person and containing ... any threat to injure the person of the addressee or of another, shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U.S.C. § 876. Notably, this section contains the adverb "knowingly," which is conspicuously absent from section 875(c).

6. Although the *Maisonet* court focused on an objective standard for determining whether a particular letter contains a threat, the opinion

contains some language which arguably supports the notion that section 876 is a specific intent crime. For example, the court determined that the evidence "was sufficient to enable the jury to find beyond a reasonable doubt that the letter constituted a threat *and [the defendant] intended it as such.*" *Id.* at 1358 (emphasis added). Also, the court approved of the trial court's jury instruction that "the government was required to prove beyond a reasonable doubt that the letter contained a threat to injure the judge *and that [the defendant] intended it to be such a threat.*" *Id.* at 1359 (emphasis added). This language in *Maisonet* was, however, merely dicta.

Judge Sobeloff stated, "a conviction under 18 U.S.C. § 875(c) requires a showing that a threat was intended." *Id.* at 333 (citing *Seeber v. United States,* 329 F.2d 572, 577 (9th Cir.1964)).[7] However, this statement was merely dictum, because the only issue directly before the court was the admissibility of certain evidence that today would be considered 404(b)-type[8] evidence.

In *Dutsch,* the defendant was convicted for threatening his adoptive mother in a phone call from California to Virginia. The defendant's mother testified that the defendant threatened her as follows: "He said, ... 'I'm coming back to Norfolk.... I don't know when I'll get there, ... but I'll be back.... I'll get you this time.... I won't miss ... You can have the law there, or whatever you please, but ... I'll not miss this time.'" *Id.* at 332–33. The trial court allowed into evidence testimony that the defendant had shot his mother when he was sixteen after he had become upset that his parents were unable to buy him a car. This court affirmed the trial court's ruling, because the evidence of the prior shooting was relevant to show that in the call to his mother the defendant "intended to threaten the same type of harm he had previously inflicted on her." *Id.* at 333. The *Dutsch* court did not directly address whether section 875(c) requires general intent or specific intent.

The better-reasoned analysis of section 875(c) is that of the Sixth Circuit in *United States v. DeAndino,* 958 F.2d 146 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 2997, 120 L.Ed.2d 874 (1992). The *DeAndino* court concluded that "[s]ection 18 U.S.C. § 875(c) does not require specific intent in regard to the threat element of the offense, but only general intent." *Id.* at 150. The court persuasively rejected the reasoning of the line of authority which holds that section 875(c) is a specific intent crime. *See id.* at 149.

Furthermore, the *DeAndino* court relied upon the rule of construction in the Sixth Circuit that if a criminal statute "'does not specify a heightened mental element, such as

specific intent, general intent is *presumed* to be the required element.'" *Id.* at 148 (quoting *United States v. Brown,* 915 F.2d 219, 225 (6th Cir.1990)). Such a presumption exists in this circuit as well. In *United States v. Lewis,* 780 F.2d 1140, 1142–43 (4th Cir. 1986), this court stated, "In the absence of an explicit statement that a crime requires specific intent, courts often hold that only general intent is needed." The *Lewis* court then applied this presumption and concluded that a conviction under 18 U.S.C. § 113(f) (assault within the maritime and territorial jurisdiction of the United States resulting in serious bodily injury) requires only general intent. 780 F.2d at 1143.

Accordingly, we conclude that section 875(c) requires only general intent to threaten. In other words, to establish a violation of section 875(c), the government must establish that the defendant intended to transmit the interstate communication and that the communication contained a true threat. Whether a communication in fact contains a true threat is determined by the interpretation of a reasonable recipient familiar with the context of the communication. The government does not have to prove that the defendant subjectively intended for the recipient to understand the communication as a threat.

### III

Darby next argues that the district court erred in not granting his motion pursuant to Rule 29 of the Federal Rules of Criminal Procedure for judgment of acquittal at the close of the Government's case because, he argues, the evidence was insufficient to sustain his conviction. In reviewing the sufficiency of the evidence, we must affirm the verdict below if there is substantial evidence, taking the view most favorable to the government, to support a finding of guilt. *United States v. Sherman,* 421 F.2d 198, 199 (4th Cir.) (per curiam), *cert. denied,* 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed.2d 78 (1970).

---

**7.** As noted *supra* in our discussion of the *Twine* case, such a reading of *Seeber* would be overly broad.

**8.** Fed.R.Evid. 404(b).

■ The interstate telephone call for which Darby was convicted is the call he made from his home in Hillsborough, North Carolina to the IRS taxpayer service representative in Nashville, Tennessee. Darby testified that he obtained the "1–800" number for the IRS Problem Resolution Office from the listing in the local Hillsborough telephone directory, which contained no notation as to the location of the office. Darby's principal argument in support of his motion for judgment of acquittal is that the Government failed to prove that he was aware of the interstate nature of his telephone call. We reject the Appellant's argument that the Government must establish that he knew his call would be transmitted in interstate commerce.

Numerous cases have held that criminal statutes based on the government's interest in regulating interstate commerce do not generally require that an offender have knowledge of the interstate nexus of his actions. *See, e.g., United States v. Blackmon,* 839 F.2d 900, 907 (2d Cir.1988) (in a wire fraud prosecution it is not necessary to show that the defendant knew interstate communications were involved); *United States v. Muza,* 788 F.2d 1309, 1311–12 (8th Cir.1986) (under the federal arson statute, it is not necessary to show that the defendant was aware that the building was used in an activity having an effect on interstate commerce); *United States v. Hankish,* 502 F.2d 71, 76 (4th Cir.1974) (a conviction for the interstate transportation of stolen property does not require knowledge by the defendant of the interstate character of the goods); *Overton v. United States,* 405 F.2d 168, 169 (5th Cir. 1968) (in a Dyer Act prosecution for receiving a stolen motor vehicle in interstate commerce it is not necessary to show that the defendant knew the stolen vehicle had travelled across state lines). As this court has previously held, the element of interstate commerce is simply "a 'jurisdictional peg' on which to hang the federal prosecution." *United States v. LeFaivre,* 507 F.2d 1288, 1299 (4th Cir.1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975). Thus, while the Government was required to prove that Darby's phone call crossed a state line (a fact not in dispute here), the Government did not need to prove that Darby knew of the interstate nexus. *Cf. United States v. Bryant,* 766 F.2d 370, 375 (8th Cir.1985) (noting that the element of "interstate nexus" is not a substantive element of the offense of wire fraud, but arises only from "constitutional limitations on congressional power over intrastate activities under the Commerce Clause"), *cert. denied,* 474 U.S. 1054, 106 S.Ct. 790, 88 L.Ed.2d 768 (1986).

■ Darby also argues that the statements attributed to him did not constitute a threat. Although he concedes that his language was "brimming with invective," he contends that his words were rambling, ambiguous, and conditional, but not threatening. We disagree. Darby's statements that he did not eat his victims but rather "killed them by blowing them up"; that the IRS could be "the next Somalia"; and that the IRS would need a flower fund for "the funerals in Durham," coupled with his statement that, if it took the IRS a few days to respond to his inquiry, "people in Durham would be dead" are all sufficient to fall within the purview of section 875(c). Jennifer Morrison, the IRS employee to whom these threats were communicated, testified that she believed Darby's statements to be serious threats. Viewed in the light most favorable to the Government, this evidence is sufficient to support the jury's guilty verdict.

### IV

■ In addition, Darby contends that the district court erred in failing to accord him a two-level reduction in his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1. We review this issue under the clearly erroneous standard of review. 18 U.S.C. § 3742(e); *United States v. Gordon,* 895 F.2d 932, 937 (4th Cir.), *cert. denied,* 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990).

Darby argues that he never denied making the statements, but went to trial only to challenge whether the statements he made constituted a threat under the law and whether there was evidence that the statements were knowingly transmitted in interstate commerce.

At trial, however, Darby testified that he had a memory lapse lasting between twenty-four and twenty-six hours, beginning sometime during the second phone conversation with Annette Miller in Durham, before the call to Nashville, and continuing until the agents arrived at his house the next day. Darby authenticated purchase and credit card receipts reflecting his acquiring bomb supplies on the day of his phone calls, but claimed amnesia as to those purchases. Furthermore, he asserted that he needed sulfur and malathion around the house to control a cockroach problem, and that he intended to make a garden sprinkler system out of the PVC piping he had purchased. On this record, we cannot say that the district court's determination that Darby was not entitled to a reduction for acceptance of responsibility is clearly erroneous.

## V

■ Darby's final contention is that the district court erred in denying his motion for a downward departure. At sentencing, Darby argued that his conduct was a single act of aberrant behavior.

■ It is now well settled in this circuit that the denial of a motion for downward departure is not reviewable on appeal unless the district court misperceived its power to depart. *United States v. Underwood,* 970 F.2d 1336, 1338 (4th Cir.1992) (citing *United States v. Bayerle,* 898 F.2d 28, 30–31 (4th Cir.), *cert. denied,* 498 U.S. 819, 111 S.Ct. 65, 112 L.Ed.2d 39 (1990)).

The record of the sentencing hearing clearly indicates that the district judge realized his authority to depart downward in this case. However, the district judge made a specific finding that the conduct for which Darby was convicted was not a single act of aberrant behavior. The district judge noted several other instances in which Darby had sent threatening communications to the IRS. Accordingly, the district judge's refusal to depart downward is not subject to review in this case.

\* Circuit Judge of the Eleventh Circuit, sitting by designation.

**1.** Due to his retirement on January 15, 1992, Chief Judge Charles Clark did not participate in

## VI

For all of the foregoing reasons, Darby's conviction and resulting sentence are hereby affirmed.

*AFFIRMED.*