46 F.3d 1127
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Alan BROOKS, Defendant-Appellant.
 No. 94-5199.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 4, 1994.
Decided Jan. 9, 1995.
 
 Appeal from the United States District Court for the Middle District of North Carolina, at Winston-Salem. Frank W. Bullock, Jr., Chief District Judge. (CR-93-120-6)
 ARGUED: John Stuart Bruce, Deputy Federal Public Defender, Greensboro, NC, for appellant. Scott Patrick Mebane, Asst. U.S. Atty., Greensboro, NC, for appellee. ON BRIEF: William E. Martin, Federal Public Defender, Greensboro, NC, for appellant. Walter C. Holton, Jr., United States Attorney, Greensboro, NC, for appellee.
 M.D.N.C.
 AFFIRMED.
 Before WILLIAMS and MICHAEL, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 
 OPINION
 PER CURIAM
 
 1
 Alan Brooks was convicted on two counts of violating 18 U.S.C. Sec. 875(c), which proscribes the communication across state lines of threats to injure the person of another. The convictions arose from two telephone conversations between Brooks and employees of Integon Insurance (Integon) in Winston-Salem, North Carolina. Brooks challenges the convictions on two grounds. First, although Brooks admits making the calls, he argues that the evidence was insufficient to show that the calls were transmitted interstate. Second, Brooks contends that nothing in his conversations with Integon employees constituted an illegal threat under Sec. 875(c). After a thorough review of the facts and applicable law, we affirm Brooks's convictions for the reasons explained below.
 
 I.
 
 2
 Brooks's interaction with Integon Insurance began after one of Integon's insureds collided with Brooks's car in July of 1992. Integon admitted liability and paid Brooks for the damage to his vehicle. In April of 1993, Integon promised to reimburse Brooks for five days' worth of car rental fees incurred while Brooks's car was in the shop for repairs.[1] On April 27, 1993, Integon allegedly sent a reimbursement check to Brooks. By May 3, 1993, Brooks claimed that he still had not received the check. Angered, he called Elizabeth Fitzpatrick, a claims representative at Integon. Using the tape machine attached to her phone, Fitzpatrick taped Brooks's call without his knowledge.
 
 
 3
 In the course of this conversation, Brooks made several statements that Fitzpatrick considered threatening. According to the transcript of Fitzpatrick's tape recording of the discussion, Brooks said:
 
 
 4
 [Y]ou [Fitzpatrick] would probably come out better to take a few days off and keep your closest friends with you, cause once I come through there, anybody that tries to stop me, I'm going to treat them just like they were a cockroach....
 
 
 5
 * * *
 
 
 6
 I know that what [Integon has] put me through, that I am sick and tired of it, and that somebody other than myself is going to suffer....
 
 
 7
 * * *
 
 
 8
 You [Fitzpatrick] have been very nice. That's exactly why I tried to get in touch with you cause, I didn't want you to be hurt.
 
 
 9
 * * *
 
 
 10
 [Y]ou know, right now I would love to get my hands on somebody who is over the whole shooting match--I just feel like unless I can throw somebody through a damn window, I'm just not going to feel good....
 
 
 11
 * * *
 
 
 12
 [W]hen I come up there, there's no telling what I might do hon. Like I said I might be like a bull in a china shop, I'm subject to taking the building down.
 
 
 13
 * * *
 
 
 14
 [I]n all honesty, I can smile at you and blow your brains out basically speaking ... and I am at the point where I would not hesitate if I thought somebody was going to try to stop me ... I could shoot them....
 
 
 15
 * * *
 
 
 16
 [I]f there is a God in Heaven, I would swear on all I hold sacred, I will come up there....
 
 
 17
 * * *
 
 
 18
 I know how to take security out, I was in Viet Nam for a long time. I was a green beret so to speak.
 
 
 19
 (J.A. at 110-15.) During the conversation, Brooks also rebuffed any of Integon's attempts to rectify the situation. For instance, while rejecting Fitzpatrick's assurance that she did not want Brooks to be upset over the matter, Brooks replied, "[w]ell I am upset and I am going to be upset until I get my hands on the, as they say, the [expletive] that's in charge of that company.... That is not a threat, that is a promise--I will be there." (J.A. at 110.)
 
 
 20
 After this conversation, Fitzpatrick immediately contacted the local police department in Winston-Salem to report Brooks's threats. The Winston-Salem police department then contacted the police department in Union Point, Georgia, where Brooks lived. The Union Point police confirmed that Brooks's car was parked in his driveway and agreed to monitor Brooks's whereabouts for the next few days.
 
 
 21
 The next day, on May 4, 1993, Brooks called Integon again, this time looking for Charlie Venable, Vice President and head of the claims department. Instead of reaching Venable, however, Brooks reached Laurie Dodson Martin, Venable's administrative assistant. After Martin explained to Brooks that Venable was not available, she asked Brooks whether he had any messages for Venable. Essentially, Brooks told Martin to tell Venable that he should kiss his children goodbye every day before he went to work, and also told her that he would watch Venable as he commuted to work. Martin further testified that [Brooks] was just--he just carried on the conversation, and he was just in a calm state, and he--he said he was going to come in to the building and take us out. And that when he busted down the doors, for me to leave; because he knew that once he got there, that he was not leaving.
 
 
 22
 (J.A. at 71.) Martin reported this conversation to the authorities, and on May 10, 1993, FBI Special Agent David Wylie interviewed Brooks at Brooks's home in Union Point. During this interview, Brooks admitted to making many of the above statements, and reiterated his intention to go to Winston-Salem, again indicating that he [Brooks] probably would not leave the building alive.
 
 
 23
 On May 14, 1993, a warrant was issued for Brooks's arrest and executed the same day. On June 1, 1993, a grand jury indicted him on two counts of violating 18 U.S.C. Sec. 875(c), for the May 3rd conversation with Fitzpatrick and for the May 4th conversation with Martin. At trial, Brooks represented himself pro se. The jury found him guilty on both counts, and subsequently, the district court sentenced Brooks to fourteen months imprisonment.
 
 II.
 
 24
 The government must prove three elements beyond a reasonable doubt to convict someone under Sec. 875(c).[2] It must show "(1) a transmission in interstate commerce; (2) a communication containing a threat; and (3) the threat must be a threat to injure the person of another." United States v. DeAndino, 958 F.2d 146, 148 (6th Cir.), cert. denied, 112 S.Ct. 2997 (1992). Because Sec. 875(c) is a general intent crime, the government need not show that the defendant intended to threaten the victim; rather, the government only bears the burden of proving that the defendant intended to communicate statements that a reasonable person would find threatening. United States v. Darby, 37 F.3d 1059, 1066 (4th Cir.1994).
 
 
 25
 Brooks challenges the sufficiency of the evidence on both counts under elements (1) and (3) above. We affirm a criminal conviction challenged on sufficiency grounds if any rational factfinder, viewing the evidence in the light most favorable to the government, could have found every essential element of the offense beyond a reasonable doubt. United States v. Vogt, 910 F.2d 1184, 1193 (4th Cir.1990), cert. denied, 498 U.S. 1083 (1991). We first review whether the evidence was sufficient to show that the communications were transmitted across state lines and then examine whether the statements threatened to injure the person of another.
 
 A.
 
 26
 The Government offered no direct proof that Brooks called Integon from outside North Carolina.[3] Yet, "[w]e must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982) (citations omitted). The Government, therefore, need only present evidence that would allow the jury rationally to infer, beyond a reasonable doubt, Brooks's presence outside North Carolina when he made the calls.
 
 
 27
 We find that there was sufficient evidence to show that the communications in question were transmitted across state lines. The Government's evidence consisted of the following: (1) Brooks's statement that he was going to come "up there" to carry out his threats (J.A. at 113); (2) the continual police surveillance of Brooks in Union Point, Georgia, beginning shortly after Brooks's first call on May 3rd and continuing until his arrest in the middle of May; (3) the fact that this police surveillance confirmed that Brooks was in Georgia shortly after the May 3rd call and during the May 4th call; (4) the implausibility of Brooks's traveling from Union Point to the North Carolina border to place the phone calls; and (5) the circumstantial evidence showing that Brooks placed the calls in question shortly after mail was delivered to his home in Union Point, suggesting that Brooks received his mail at home and then called Integon. The evidence does not exclude every possibility that Brooks was in North Carolina when he made the calls on May 3rd and 4th. We conclude, however, that a jury drawing all reasonable inferences from the Government's evidence could easily find beyond a reasonable doubt that Brooks was at his home in Union Point when he placed both calls to Integon.
 
 B.
 
 28
 "Whether a communication in fact contains a true threat is determined by the interpretation of a reasonable recipient familiar with the context of the communication." Darby, 37 F.3d at 1066. This is an objective standard requiring a review of the totality of the circumstances surrounding the discourse. In Darby, we found that threats communicated over the Internal Revenue Service's problem-solving line were actionable under Sec. 875(c). There, defendant Darby "asked if [the call's recipient] knew who Jeffrey Dahlmer [sic] was." Id. at 1061. Darby said that "he didn't eat his victims, like Jeffrey Dahlmer; [sic] that he just killed them by blowing them up." Id. Here, a reasonable recipient would find both of Brooks's calls to Integon at least as threatening as the call we found sufficient to sustain the conviction in Darby.
 
 
 29
 The May 3rd call to Fitzpatrick is replete with communications that a "reasonable recipient" would find threatening (and that Fitzpatrick in fact did find threatening). Among other things, Brooks informed Fitzpatrick that "in all honesty, I can smile at you and blow your brains out"; that "once I come through there, anybody that tries to stop me, I'm going to treat them just like they were a cockroach"; and, that "unless I can throw somebody through a damn window, I'm just not going to feel good." (J.A. at, respectively, 114, 110, 112.) Furthermore, Brooks continually warned Fitzpatrick to leave the building so that she could avoid his wrath when he arrived. We are firmly convinced that a reasonable person would consider these statements as threats to injure the person of another.
 
 
 30
 The May 4th conversation between Brooks and Martin involves one exchange in which Brooks stated, according to Martin,
 
 
 31
 Charlie Venable should kiss his children goodbye every day before he came to work, and that [Brooks] was coming to Integon, and that he was far away at that time; he had a few things he needed to take care of, but that he would be coming to Integon, and that he could find out who Charlie was, and he could watch him come and go every day from work.
 
 
 32
 (J.A. at 70.) Upon hearing this, Martin testified that she "felt he was physically threatening [her] personal being." (J.A. at 71.) Even if Brooks uttered this statement as a benign word of advice to Venable,[4] Brooks's tone and the overall context of the communication as Martin described at trial, would lead an objectively reasonable factfinder to believe that Brooks was threatening Charlie Venable and the Integon staff. We therefore find the evidence sufficient as to this element of Sec. 875(c).
 
 III.
 
 33
 For the foregoing reasons, we affirm Brooks's convictions on both counts. In doing so, we are mindful of two basic legal principles that guide our review. First, even when the government presents no direct evidence of an interstate nexus, a criminal conviction should be upheld when the jury can reasonably infer beyond a reasonable doubt the required interstate connection. Tresvant, 677 F.2d at 1021. Second, a communication constitutes a threat not only when the defendant specifically intends to convey a threat, but whenever a reasonable recipient would construe it as one. Darby, 37 F.3d at 1066. Following these rules, we conclude that Brooks was properly convicted of violating Sec. 875(c).
 
 AFFIRMED
 
 
 [1]
 Brooks blamed the delay between the date of the accident and the date of repairs on the difficulty in finding a used fender for his vehicle. (J.A. at 35.)
 
 
 [2]
 Section 875(c) reads:
 Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined not more than $1000 or imprisoned not more than five years, or both.
 18 U.S.C. Sec. 875(c) (1988).
 
 
 [3]
 At oral argument, counsel for the Government represented that it normally submits phone records into evidence showing the location from which the calls were placed. In Mr. Brooks's case, however, the phone company did not maintain these records because Brooks placed the calls to Integon's toll-free "800" number. As a matter of course, the phone company only records calls made to "800" numbers from phones within the same area code as the "800" number
 
 
 [4]
 While cross-examining Ms. Martin at trial, Brooks told her that "[i]n the first place, little lady, I think everybody should kiss their children before they leave every day, not just what I supposedly told you to tell someone else. I mean, that's no big thing." (J.A. at 72.)